UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERTO ANDRES MORALES,

                                        Plaintiff,

                v.

BOTTLING GROUP, LLC,

                                Defendant.
_____

BOBBY CAMPBELL, JR.,

                                        Plaintiff,

                v.

BOTTLING GROUP, LLC,

                                Defendant.
_____

DECISION AND ORDER

16-CV-6597L

16-CV-6600L

**INTRODUCTION**

        Roberto Morales ("Morales") and his brother, Bobby Campbell ("Campbell") (together,

the "plaintiffs"), filed separate *pro se* complaints against Bottling Group, LLC ("Bottling

Group"),[1] alleging race-and-color-based discrimination, hostile work environment, and retaliation

---

[1] Bottling Group has consistently maintained that it is the true defendant-in-interest in this case, not "Pepsi Co., Inc.," as originally sued by plaintiffs. In Morales's case, the caption was amended to so reflect. (Dkt. # M41). The Court hereby amends the caption in Campbell's case *sua sponte* to reflect the same.

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 298, *et seq.*

Pending are Bottling Group's motions for summary judgment. (Dkt. ## M31; C56).[2] Because the allegations, backgrounds, and defenses in both cases are similar, the Court will address both motions in this single decision. For the following reasons, Bottling Group's motions are granted, and Morales's and Campbell's Complaints (Dkt. ## M1; C1), are dismissed in their entirety and with prejudice.

# FACTS[3]

## A. <u>Bottling Group and the Account Merchandiser Position</u>

Bottling Group is a seller and distributor of Pepsi products, and has a distribution facility in Rochester, New York. (Dkt. ## M31-1 at ¶ 12; C56-1 at ¶ 13). In addition to staff at the facility, Bottling Group employs Bulk Customer Representatives ("BCRs") and Account Merchandisers ("Merchandisers"), both of which service customer stores. (Dkt. ## M31-1 at ¶¶ 13-14; C56-1 at ¶¶ 14-15). BCRs travel daily to customer stores, interface with store managers, order necessary Pepsi products and provide merchandise for the stores. (Dkt. ## M31-1 at ¶¶ 16-17; C56-1 at

---

[2] Citations to Morales's case will be preceded by an "M," and citations to Campbell's case will be preceded by a "C."

[3] The Court draws the following facts from the parties' Local Rule 56 submissions. Plaintiffs each received the *pro se* summary judgment notice, yet still largely failed to comply with the local rules, or even respond to or otherwise specifically controvert the majority of Bottling Group's statements. *See Cabassa v. Gummerson*, 2006 WL 1559215, *1 (N.D.N.Y. 2006) (noting that to "specifically controvert" a statement of material fact, the party must file a response that "set[s] forth a specific citation to the record where the factual issue arises"), *report and recommendation adopted by*, 2006 WL 1555656 (N.D.N.Y. 2006); *see also Gittens v. Garlocks Sealing Techs.*, 19 F. Supp. 2d 104, 110 (W.D.N.Y. 1998) ("proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment"). Accordingly, the Court will deem admitted those statements that plaintiffs have failed to respond to or otherwise controvert, to the extent they are supported by record evidence. *See Hamilton v. Robinson*, 2018 WL 4334769, *2 (W.D.N.Y. 2018).

¶¶ 14-15). Merchandisers—a level below BCRs—act as "back up" for BCRs; they generally cover for BCRs when BCRS are off from work. (Dkt. ## M31-1 at ¶¶ 19-20, 23; C56-1 at ¶¶ 20-21, 24).

Morales and Campbell were both Merchandisers. They were supervised by several people at Bottling Group, including Sean Trottier ("Trottier") and Robert Flaherty ("Flaherty"), who are Caucasian, and James Sapp, Jr. ("Sapp"), who is African American. Trottier, Flaherty, and Sapp were all supervised by Jesse Pitts ("Pitts"), who is Caucasian. (Dkt. ## M31-1 at ¶¶ 60-68; C56-1 at ¶¶ 62-70).

As Merchandisers, plaintiffs had to follow various company policies and procedures, specifically, the "P.R.E.M.I.E.R. In-Store Service Process," which provided guidance on how to service each customer's store. (Dkt. ## M31-1 at ¶¶ 28-41; C56-1 at ¶¶ 29-42). This process required Merchandisers to "scan-in" and "scan-out" at each location, in order to record the time spent at a specific location. (Dkt. ## M31-1 at ¶¶ 30, 42; C56-1 at ¶ 30, 44). Plaintiffs received formal and informal training on P.R.E.M.I.E.R. and failing to follow it was a "serious violation" of company policy. (Dkt. ## M31-1 at ¶¶ 44-46; C56-1 at ¶¶ 45-48).

Bottling Group also reimbursed Merchandisers for their work-related mileage. (Dkt. ## M31-1 at ¶ 47; C56-1 at ¶ 49). Accordingly, Merchandisers were expected to track and submit their mileage to Bottling Group at the end of each work week. (Dkt. ## M31-1 at ¶ 50; C56-1 at ¶ 52). Although there was no formal policy pertaining to tracking mileage, (Dkt. # C64 at 3-4), Trottier discussed, at least to some extent, the need for plaintiffs to track their mileage, (Dkt. ## M36 at ¶ 3; C59 at 2, ¶ 9). Plaintiffs maintain, however, that they were never formally trained on how to track their mileage. (Dkt. ## M36 at ¶ 6; C59 at 2, ¶ 12).

The parties do not seem to dispute the method of tracking mileage. According to Bottling Group, mileage generally "start[ed] with the first scheduled customer store and end[ed] with the

last scheduled customer store, except when, on occasion, Merchandisers [had to] stop at the Rochester facility to attend a meeting, update handhelds, or pick up product displays." (Dkt. ## M31-1 at ¶ 47; C56-1 at ¶ 49). Based on the odometer, Merchandisers submitted the distance traveled from store to store during a shift. (Dkt. ## M31-1 at ¶ 49; C56-1 at ¶ 51). Morales calculated his mileage "starting after arriving at [his] first store or at the plant," (Dkt. # M36 at ¶ 2), and Campbell apparently tracked his mileage beginning and ending at the Rochester facility on occasions when he passed or stopped by that location, (Dkt. # C59 at 2, ¶ 9).

Merchandisers reviewed various company policies at the outset of their employment, including the General Rules of Conduct, the Global Code of Conduct, and the Employee Handbook. (Dkt. ## M31-1 at ¶ 53; C56-1 at ¶ 54). Pursuant to those documents, employees who felt discriminated against, retaliated against, or harassed, could report such conduct to a manager, Human Resource representative, or the company's "Speak Up" line. (Dkt. ## M31-1 at ¶¶ 54-55; C56-1 at ¶¶ 55-56). Company rules also prohibited the "misrepresentation of facts or falsification of Company records or other documents," and the "intentional concealment, alteration, or falsification of information for personal benefit"; violating these rules was deemed to be a "serious infraction." (Dkt. ## M31-1 at ¶¶ 56-57; C56-1 at ¶¶ 57-59).

## B. **Morales's Employment with Bottling Group**

Morales began working as a part-time Merchandiser on June 26, 2013, and became full-time by December 29, 2013. (Dkt. # M31-1 at ¶ 81, 85).

### 1. **The Open BCR Position**

In December 2014, Morales applied for an open BCR position and was interviewed by Trottier and Flaherty. (*Id.* at ¶ 99). For these positions, Bottling Group maintained an internal policy to "promote the best suited individual for the job, based upon merit and seniority." (*Id.* at

¶ 101). Based on these criteria, Bottling Group promoted Chuck Jewell—not Morales. (*Id.* at ¶ 102). According to Bottling Group, Jewell was more qualified for the open BCR position because he was already a BCR for another geographical area and had been employed by Bottling Group since 2009. (*Id.* at ¶¶ 97, 102-03). Morales did not apply for Jewell's former BCR position and did not complain then about Bottling Group's decision. (*Id.* at ¶ 104-06).

### 2. Performance Issues

P.R.E.M.I.E.R. required Morales to obtain a customer's signature, such as the store manager, prior to leaving the store, (*id.* at ¶¶ 37-38), and to fill the store with Pepsi products, (*id.* at ¶ 35). Bottling Group claims that on February 7, 2015, Morales failed to do either these things at a specific store. (*Id.* at ¶¶ 107-08). Morales contends that he was not a regular at that store, that he signed out with who he believed to be the assistant manager, and that there was no more Pepsi products at the store. (Dkt. # M36 at ¶¶ 9-10). On February 9, 2015, Pitts discussed these issues with the customer, who requested that Morales no longer service his store. Morales concedes that this was a "serious violation." (Dkt. # M31-1 at ¶ 109-11). Pitts, therefore, issued Morales a written warning on February 13. (*Id.* at ¶ 110, 112).

In addition, on March 27, 2015, Morales—and Campbell—met with Flaherty and Pitts to discuss the new attendance policy and safety training (the "March 27 Meeting"). (*Id.* at ¶¶ 115-17). During that meeting, Flaherty told plaintiffs that they had a "stink" on them based on, apparently, their recent job performance. (*Id.* at ¶¶ 118-20). Morales understood this to mean "basically that there w[ere] people that didn't like us and that we needed to try to figure out a way to get that stank off." (*Id.* at ¶ 122). Morales also told Flaherty and Pitts that "people were treating . . . [him] differently," (*id.* at ¶ 124), although he failed to provide specific details of this treatment because,

according to Morales, the person who was "treating [him] differently/ discriminating against [him] . . . was at the table and [Morales] didn't feel comfortable," (Dkt. # M36 at ¶ 16).

On April 5, 2015, Pitts learned that another customer had requested that Morales no longer service its store due to performance issues. (Dkt. # M31-1 at ¶ 127). Morales also apparently had told the customer that he was late on a specific day because another store was a higher priority. (Dkt. ## M31-1 at ¶¶ 130-31; M36 at ¶ 18). In Morales's words, the customer "came at . . . [him] with disrespect . . . [and he] answered [the customer] the [same] way[.]" (Dkt. # M31-1 at ¶ 131).

Morales met with Pitts on April 13, 2015, at which Pitts planned to issue Morales a Last Chance Agreement based on customer complaints (the "April 13 Meeting"). (*Id.* at ¶¶ 128, 133). At the meeting, Morales complained that Flaherty was "treating him differently," but failed to provide Pitts with examples (the "April 13 Complaint"). (*Id.* at ¶ 136). Morales claims Pitts barely gave him the opportunity to talk, and that his concerns were "shot down." (Dkt. # M36 at ¶ 20).

Pitts then issued Morales the Last Chance Agreement, which Morales signed on April 13, 2015. (Dkt. # M31-1 at ¶ 137). By doing so, Morales agreed to follow company rules and understood the failure to do so could result in termination. (*Id.* at ¶ 139).

### 3. **Morales's Termination from Bottling Group**

Several months later, in June 2015, Sapp reported to Pitts that one Merchandiser had "unusually high mileage reimbursement requests." (Dkt. # M31-1 at ¶ 142). This prompted Pitts to perform a mileage audit of ten Merchandisers[4] from May 24, 2015, through June 28, 2015 (the "Audit"). Pitts used "scan-in" and "scan-out" reports to determine which stores Merchandisers traveled to, used MapQuest to calculate the distance between those stores, and compared that number to the reported mileage. (*Id.* at ¶ 143-46). Pitts completed this process a second time,

---

[4] Of the ten, seven were Caucasian, two were African American, and one was Hispanic or Latino. (*Id*).

beginning and ending his MapQuest calculation from the Rochester facility, as opposed to the first and last customer store. (*Id.* at ¶ 148). In both instances, Pitts discovered that the same two Merchandisers had reported consistently higher mileage compared to MapQuest's calculations. (*Id.* at ¶¶ 147, 150).

Morales was one of these two Merchandisers (the other was Campbell). (*Id.* at ¶ 151). Pitts determined that although Morales reported 1,595 miles traveled, MapQuest indicated that Morales only drove 1,083 miles, which resulted in a $290.40 reimbursement overpayment. (*Id.* at ¶ 152-53). Morales denies any wrongdoing. In Pitts's view, this conduct violated the rule against misrepresenting facts or falsifying company records or other documents and, in Morales's circumstance, also the Last Chance Agreement. (*Id.* at ¶ 154). As a result, Pitts terminated Morales's employment on July 6, 2015. (*Id.* at ¶ 157).

### 4. **Morales's "Speak Up" Complaint**

The following day, July 7, 2015, Morales reported Pitts and Sapp to the "Speak Up" line. (*Id.* at ¶¶ 164, 167). Morales complained that Pitts and Sapp did not show him proof of falsified mileage reports, and believed that the issue was race discrimination. (*Id.* at ¶ 165-66). The HR Department concluded that his termination was justified. (*Id.* at ¶ 168).

### C. **Campbell's Employment with Bottling Group**

Campbell began with Bottling Group on September 7, 2014. (Dkt. # C56-1 at ¶ 84). Prior to that, Campbell worked as a Merchandiser at another Pepsi affiliate, which had similar training and policies, thus obviating the need for such training with Bottling Group. (*Id.* at ¶ 85-88, 90). Campbell did not apply for a promotion or other position at Bottling Group. (*Id.* at ¶¶ 181, 183).

He attended the March 27 Meeting, at which Flaherty discussed the new attendance policy, and told Campbell, as he did Morales, that there was a "stink" on him also due to performance

issues. (*Id.* at ¶ 112). Campbell disputes that he had performance issues. During that meeting, Campbell told Flaherty and Pitts that he was being "treated differently," but did not provide any specific examples of differential treatment. (*Id.* at ¶ 118).

### 1. <u>Attendance and Performance Issues</u>

The attendance policy prohibited employees from texting supervisors about the need to take off work; rather, employees had to contact supervisors "directly over the phone," and leave a voicemail if the supervisor was unavailable. (*Id.* at ¶ 109; Dkt. # C56-3 at 170). Bottling Group claims that Campbell violated the policy on April 6, 2015, and three times between April 24, 2015, and April 27, 2015, by texting his supervisor that he could not make a scheduled shift. (Dkt. # C56-1 at ¶¶ 120, 124). He did so again on April 28, 2015. (*Id.* at ¶ 125). Campbell also apparently failed to follow P.R.E.M.I.E.R. policy on April 8, 2015, and April 11, 2015, by failing to scan-in and scan-out at one customer store, and failing to check out with another customer before leaving the location. (*Id.* at ¶¶ 121, 123). On May 2, 2015, Campbell left another store without the customer's signature. (*Id.* at ¶ 126).

On May 6, 2015, Flaherty and Sapp met with Campbell and issued him two verbal warnings based on the April 28 and May 2 violations. (*Id.* at ¶ 128). After that meeting, Campbell called the "Speak Up" line to report incidents with Flaherty that Campbell felt had happened because "he is black, and Flaherty is white" (the "May 6 Complaint"). (*Id.* at ¶ 129). The following day, Pitts removed both verbal warnings, after learning that the April 28 and May 2 violations stemmed from medical issues. (*Id.* at ¶ 130). Beyond these verbal warnings, Campbell was not disciplined during his time at Botting Group. (*Id.* at ¶ 131-33).

The HR Department investigated the May 6 Complaint and determined that the verbal warnings were removed, and that other Merchandisers were being held accountable for violating

company policies and P.R.E.M.I.E.R. (*Id.* at ¶ 139). Specifically, two Caucasian Merchandisers were on Last Chance Agreements, and one Caucasian Merchandiser had received a verbal warning, for failing to follow P.R.E.M.I.E.R. (*Id.*). Also, Sapp replaced Flaherty as Campbell's supervisor.

### 2. Campbell's Termination from Bottling Group

On June 22, 2015, Sapp spoke with Campbell after flagging his mileage reimbursement request for 688 miles as "unusually high." (*Id.* at ¶ 146-47, 149). Campbell then texted Pitts that, as a compromise, he would settle to be reimbursed for 420 miles. (*Id.* at ¶ 148).

Campbell was, thereafter, subject to the Audit. Pitts determined that Campbell had submitted for 577 more miles than MapQuest's calculation, which resulted in a $331.78 reimbursement overpayment. (*Id.* at ¶ 163-64). In Pitts's view, as with Morales, this violated Bottling Group's rules against misrepresenting facts or falsifying records or other documents. (*Id.* at ¶ 161, 166). Campbell denies any wrongdoing. Accordingly, and in consultation with the HR Department, Pitts terminated Campbell's employment on July 6, 2015. (*Id.* at ¶ 169).

### 3. Campbell's "Speak Up" Complaint

Campbell, too, filed a "Speak Up" complaint on July 7, 2015. (*Id.* at ¶ 174). He complained that Pitts had not shown him evidence of his inaccurate mileage reporting, and indicated that he was terminated and "targeted" by Pitts and Sapp because of the May 6 Complaint. (*Id.* at ¶ 175-76). The HR Department concluded that his termination was justified. (*Id.* at ¶ 177).

## DISCUSSION

### I. Legal Standard for Summary Judgment

Summary judgment will be granted if the record demonstrates that "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-movant. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must view all ambiguities and inferences that may be reasonably drawn from the facts in the light most favorable to the non-moving party, *see Anderson*, 477 U.S. at 255. To defeat a motion for summary judgment, the non-moving party cannot rely "on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citation omitted). Rather, the nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton Cty., New York*, 541 F.3d 464, 471 (2d Cir. 2008), *cert. denied*, 556 U.S. 1128 (2009).

## II.     Analysis—Intentional Discrimination

Morales and Campbell allege that Bottling Group intentionally discriminated against them by failing to promote them and, ultimately, firing them because of their race and color in violation

of Title VII and the NYSHRL.[5]   Such claims are analyzed pursuant to the three-part, burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this framework, a plaintiff must first establish a prima facie case of racial discrimination.  *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  A Title VII discrimination claim fails absent this prima facie showing.  *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004) (Sotomayor, J.).  However, if the plaintiff meets this burden, the employer must then provide a legitimate, nondiscriminatory reason or motive for the adverse employment action.  *Ruiz*, 609 F.3d at 492.  The burden then shifts back to the plaintiff to demonstrate that the employer's stated reasons are merely a pretext for discrimination.  *Id.*

## 1. <u>Discriminatory Termination</u>

In the context of discriminatory termination, a plaintiff establishes a prima facie case if: (1) he or she is member of a protected class; (2) he or she was qualified for the position; (3) he or she was terminated; and (4) the termination occurred under circumstances giving rise to an inference of discrimination.  *See Ruiz*, 609 F.3d at 491-92.

A plaintiff can raise an inference of discrimination by showing that an employer treated him or her "less favorably than a similarly situated employee outside his [or her] protected group." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).  The comparator, however, "must be similarly situated to the plaintiff in all material respects."   *Ruiz*, 609 F.3d at 494 (quotations omitted).  "The question of whether two individuals are similarly situated may present a factual issue for the jury, but a court can properly grant summary judgment where it is clear that no

---

[5] Title VII and NYSHRL claims require the same analysis for purposes of this motion, and therefore, the Court will only address the Title VII claim.  *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006) ("the standards for liability under [the NYSHRL] are the same as those under the equivalent federal antidiscrimination laws").

reasonable jury could find the similarly situated prong met." *Parrilla v. City of New York*, 2011 WL 611849, *8 (S.D.N.Y. 2011) (quotations omitted).

A plaintiff can also raise an inference of discrimination by demonstrating that the employer "criticized plaintiff's performance in 'ethnically degrading terms,' or made 'invidious comments about others in the employee's protected group,' or otherwise demonstrated bias in 'the sequence of events leading to the plaintiff's discharge." *Velez v. SES Operating Corp.*, 2009 WL 3817461, *8 (S.D.N.Y. 2009) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001), *cert. denied*, 534 U.S. 993 (2001)).

Moreover, in the discrimination context, "it is not the role of federal courts to review the correctness of employment decisions or the processes by which those decision are made." *Sassaman v. Gamache*, 566 F.3d 307, 314 (2d Cir. 2009). "The law requires courts to respect an employer's decision to hire or fire employees according to its own criteria, so long as they do not include unlawful discrimination." *Velez*, 2009 WL 3817461 at *12.

### a. **Morales**

Morales has failed to establish a prima facie case of discrimination for at least two reasons. First, he has not shown that he was qualified to be a Merchandiser at the time he was terminated in July 2015. Bottling Group had issued Morales the Last Chance Agreement in April 2015 after a series of performance issues, including the fact that *two* different customers had requested he no longer service their stores, and ultimately terminated Morales's employment for violating the terms of the Last Chance Agreement. This is enough to show that Morales was not qualified for the position. *See Williams v. Alliance Nat'l Inc.*, 24 Fed. Appx. 50, 52 (2d Cir. 2001) ("district court properly relied on the performance memoranda detailing the deficiencies of [plaintiff's]

performance . . . to find that she was unqualified for the position at the time of her termination and hence failed to make out a prima facie case [of discrimination]").

Even if Morales could show that he was qualified, however, he clearly cannot raise an inference of discrimination related to his termination. Specifically, Morales has not identified any comparator who was treated more favorably than him, instead alleging that management "treat[ed] minority employees differently than Caucasian employees," and subjected minorities to "unequal terms, conditions, and privileges of employment as compared to non-minority employees." (Dkt. # M1 at 7-8).

Without more, such generalized allegations are insufficient to show that anyone was similarly situated to Morales. *See Graham v. Elmira Sch. Dist.*, 2015 WL 1383657, *5 (W.D.N.Y. 2015) ("Conclusory statements to the effect that similarly situated employees outside of the plaintiff's protected class were treated more favorably than the plaintiff have been held insufficient to defeat summary judgment"; "[b]ecause [p]laintiff has provided no detail about the 'Caucasian principals' whom she references in her Amended Complaint, she cannot establish that they were similarly situated"). Thus, Morales cannot raise an inference of discrimination on this basis.

Nor can Morales establish an inference of discrimination based on how management allegedly treated him leading up to his termination. Flaherty's "stink" comment at the March 27 Meeting cannot support such an inference. The evidence does not suggest that the comment was, in fact, racial, and, in any event, Flaherty neither recommended nor was involved in the decision to terminate Morales. *See Nweze v. New York City Transit Auth.*, 115 Fed. Appx. 484, 485 (2d Cir. 2004) (summary order) (allegedly racist comment made by person not involved with decision to discharge plaintiff could not support a finding that the discharge was based on plaintiff's race).

Moreover, Morales has presented no evidence that the remaining allegations of unfair treatment—job performance scrutiny by Pitts and Sapp, daily harassment from December 14, 2014, to July 6, 2015, and not receiving weekly work emails or being invited to meetings or events—were motivated by Morales's race or color.  In the absence of specific evidence showing otherwise, Morales's conclusory allegations and personal speculation, alone, is insufficient to infer discrimination.  *See Boise v. New York Univ.*, 2005 WL 2899853, *4 (S.D.N.Y. 2005) ("Personal speculation is insufficient to raise an inference of discrimination."), *aff'd*, 201 Fed. Appx. 796 (2d Cir. 2006) (summary order).

Therefore, Morales's discriminatory termination claim is dismissed.

### b. **Campbell**

Campbell also cannot establish a prima facie case of discrimination.  Initially, Campbell appeared to have his own performance issues in early April due to violating the attendance and P.R.E.M.I.E.R. policies, even though Bottling Group did not discipline him for such violations.  Bottling Group also terminated him for misrepresenting facts and falsifying records related to mileage reimbursement.  Therefore, there is at least a serious question as to whether Campbell was qualified to be a Merchandiser.  *See Williams*, 24 Fed. Appx. at 52.

In any event, though, Morales has failed to raise an inference of discrimination.  Like Morales, Campbell has not established that non-minority, similarly situated employees were treated more favorably than him.  In an effort to do so, Campbell argues that two Caucasian Merchandisers also falsified their mileage reports and were overpaid as a result, yet were not terminated.  (Dkt. # C59 at 4, ¶¶ 13-14).  It is undisputed, though, that based on the Audit, Campbell reported miles 31% higher than what MapQuest calculated, whereas the two Caucasian Merchandisers only reported miles an average of 9% higher than MapQuest's calculations.  (Dkt.

# C64 at 22). According to Bottling Group, Pitts accounted for some differential in mileage calculations in the Audit. (*Id.*). Still, Campbell's differential was 577 miles, compared to 36 miles and 56 miles in the case of the two Caucasian employees, respectively. (*Id.* at 23).

The Court does not find this vast difference to be "comparable conduct," and therefore, finds that the two Caucasian employees were not similarly situated to Campbell. *See Ruiz*, 609 F.3d at 493-94; *Parrilla*, 2011 WL 611849 at *8.

Aside from this, Campbell states in general terms that "minority employees [were treated] differently than Caucasian employees[,] [m]inority employees were harassed[, and] [minority employees'] performance was criticized." (Dkt. # C1 at 7). This, too, is insufficient to raise an inference of discrimination. *See Graham*, 2015 WL 1383657 at *5.

Moreover, Flaherty's "stink" comment fails to raise an inference of discrimination, principally because he was not involved in the decision to terminate Campbell. *See Nweze*, 115 Fed. Appx. at 485. Campbell has also not presented evidence that any conduct by Pitts or Sapp— similar in nature to the conduct alleged by Morales—was racially motivated.

For these reasons, Campbell's claim for discriminatory termination is also dismissed.

## 2. **<u>Discriminatory Failure to Promote</u>**

To establish a prima facie case under this theory, a plaintiff must show that (1) he or she is a member of a protected class; (2) he or she applied and was qualified for an open position; and (3) he or she was rejected for the open position under circumstances giving rise to an inference of unlawful discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The Court agrees with Bottling Group that neither Morales nor Campbell have established a prima facie case under this theory of discrimination.

### a. Morales

Morales attempts to raise an inference of discrimination solely by alleging that "[he] was denied a promotion," (Dkt. # M1 at ¶ 19), and that Bottling Group gave the job to Chuck Jewell, a "Caucasian guy." (Dkt. # M31-5 at 34). Yet the undisputed evidence shows that Jewell and Morales were not "similarly situated in all material respects." *Roa v. Mineta*, 51 Fed. Appx. 896, 899 (2d Cir. 2002) (summary order); *Parrilla*, 2011 WL 611849 at *8.

Bottling Group's internal policy was to "promote the best suited individual for the job, based upon merit and seniority." (Dkt. # M31-1 at ¶ 101). Here, Jewell had been employed as a BCR for another geographical route prior to interviewing for the new BCR position. Morales, on the other hand, was a Merchandiser, which is a level below a BCR. In addition, Jewell had been a Bottling Group employee for nearly four years longer than Morales at the time of the interview.

Clearly, Jewell and Morales were not similarly situated. *See Parrilla*, 2011 WL 611849 at *8. Morales, then, has failed to raise an inference of discrimination related to Bottling Group's decision to promote Jewell over him. *See Wharff v. State Univ. of New York*, 413 Fed. Appx. 406, 408 (2d Cir. 2011) (summary order) ("Where a decision to promote one person rather than another is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn.") (alterations and quotations omitted).

### b. Campbell

Campbell also generally alleges that he was "[d]enied [a] promotion [in the] month[s] of May and June 2015." (Dkt. # C1 at 5). At his deposition, Campbell stated that although he explained to Trottier his interest in a BCR position, he did not apply for any promotion or open position because "[t]here wasn't nothing for [him] to apply." (Dkt # C56-3 at 46). Instead, he claims that Bottling Group "stalled" him out by never removing other BCRs to promote him.

Campbell fails to establish a prima facie case of discriminatory failure to promote. He has not shown that there was an open BCR position in May and June 2015 and, significantly, he did not even apply for such a position. *See Matthews v. Corning Inc.*, 77 F. Supp. 3d 275, 288 (W.D.N.Y. 2014) ("[p]laintiff cannot establish a *prima facie* case because she did not specifically apply for any of the positions that she claims she was denied"). Also, his supposed "general request for a promotion" to Trottier is insufficient for this type of claim. *See Romaine v. N.Y.C. Coll. of Tech.*, 2012 WL 1980371, *3 (E.D.N.Y. 2012).

Moreover, Campbell cannot raise an issue of fact based on his own opinion that Bottling Group did not promote him for discriminatory reasons. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 74-75 (2d Cir. 2015) ("a plaintiff's 'feelings and perceptions of being discriminated against' do not provide a basis on which a reasonable jury can ground a verdict").

Accordingly, Campbell's discriminatory failure to promote claim is dismissed.

## III.    Analysis—Hostile Work Environment

To prove a hostile work environment claim, a plaintiff must show that the conduct "(1) is objectively severe or pervasive in that it creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic." *Figueroa v. Johnson*, 648 Fed. Appx. 130, 134 (2d Cir. 2016) (summary order).

"The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). To make this showing, the plaintiff "must demonstrate either that a single incident was extraordinarily severe, or that a series of

incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* at 374 (quotations omitted).

### a.  Morales

Morales alleges several instances he claims amount to a hostile work environment, including being verbally insulted by Flaherty at the March 27 Meeting, "harassed daily" from December 2014 to July 6, 2015, intentionally not emailed about work information, mandatory meetings, or company events, yelled and sworn at by Sapp in June 2015, and scrutinized by Sapp and Pitts.  (Dkt. # M1 at 5, 7-8).  Bottling Group argues that this conduct was neither racially motivated nor sufficiently severe or pervasive to alter the conditions of Morales's employment. The Court agrees with both of Bottling Group's arguments.

Morales fails to demonstrate that any of the alleged conduct was racially motivated. Regarding Flaherty's "verbal insult," Morales's own testimony suggests he did not perceive it to be racially motivated at the time, (Dkt. # M31-5 at 27) (explaining that he understood the comment to mean that "there was people that didn't like [he and Campbell] and that [they] needed to try to figure out a way to get that stank off"), and that one-time comment is "too infrequent and insufficiently severe" to support his claim.  *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 Fed. Appx. 739, 745 (2d Cir. 2014) (summary order).

Indeed, Morales relies only on his speculative self-belief that the remaining allegations of harassment—undue scrutiny, criticism, yelling, and not receiving work emails—were motivated because of his membership in a protected class.  That is insufficient to set forth a hostile work environment claim.  *See Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 400 (S.D.N.Y. 2010) ("Even assuming [plaintiff] was treated harshly by [employer], the record does not contain sufficient evidence to support a finding that his treatment was racially motivated.").

Moreover, Morales has not demonstrated that the above-allegations were sufficiently pervasive or severe to alter his working conditions. The Second Circuit has described similar types of perceived harassment as "quite minor," and insufficient to amount to a hostile work environment. *Fleming v. MaxMara USA, Inc.*, 371 Fed. Appx. 115, 119 (2d Cir. 2010) (summary order) (finding allegations that employer wrongfully excluded plaintiff from meetings, excessively criticized plaintiff's work, and refused to answer work-related questions to be "quite minor" and not supportive of an environment that was pervasive or severe).

In addition, absent extreme circumstances, which are not present here, "job performance criticism does not create a hostile work environment." *Busby v. Syracuse City Sch. Dist.*, 2017 WL 1380573, *6 (N.D.N.Y. 2017), *aff'd*, 715 Fed. Appx. 63 (2d Cir. 2018) (summary order); *see also Opoku v. Brega*, 2016 WL 5720807, *13 (S.D.N.Y. 2016) (allegations that supervisors wrongfully reprimanded plaintiff, criticized his work or attitude, and overly scrutinized his work could not support a claim for hostile work environment); *Marcus v. Barilla Am. NY, Inc.*, 14 F. Supp. 3d 108, 113 (W.D.N.Y. 2014) ("a series of sporadic, isolated incidents in which managers verbally disagreed with plaintiff or criticized her job performance . . . falls well short, as a matter of law, of describing discriminatory conduct that is objectively threatening, intimidating, humiliating or harassing, let alone so severe or pervasive, as to render [plaintiff's] hostile work environment claims plausible"). Here, Bottling Group's criticism of Morales was based on many alleged performance issues raised by several customers.

Accordingly, Morales has failed to establish a prima facie case for a hostile work environment, and that claim is dismissed.

### b. **Campbell**

Campbell's hostile work environment claim is similarly predicated on allegations that he was "verbally insulted" by Flaherty, "harassed daily" from March 2015 to July 2015, denied weekly communications from April 2015 to June 2015 regarding job duties, written up for being ill and calling in sick, and, generally, that "minority employees were harassed [and their job] performance was criticized." (Dkt. # C1 at 5, 7-8).

For the reasons set forth above, Flaherty's comment at the March 27 Meeting did not create a hostile work environment. *See Wesley-Dickinson*, 586 Fed. Appx. at 745. Also, aside from Campbell's conclusory allegations that he was harassed and criticized for his job performance, he fails to put forth evidence establishing that conduct was motivated by his race or color, which is fatal to his claim. *See Opoku*, 2016 WL 5720807 at *14 ("none of the incidents alleged by [p]laintiff explicitly invoked his race or national origin").

In any event, the verbal warnings Campbell received were based on perceived job performance issues, such as adhering to the attendance and P.R.E.M.I.E.R. policies. As mentioned above, "job performance criticism does not create a hostile work environment." *Busby*, 2017 WL 1380573 at *6; *see also Opoku*, 2016 WL 5720807 at *13; *Marcus*, 14 F. Supp. 3d at 113.

In short, there is no evidence that Pitts's and Sapp's criticism or scrutiny of Campbell was sufficiently pervasive or severe to alter his working conditions, let alone based on his race or color. Therefore, Campbell's hostile work environment claim is dismissed.

## IV.  **Analysis—Retaliation**

Discriminatory retaliation claims are analyzed under the *McDonnell-Douglas* burden-shifting analysis. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). To

establish a prima facie case, a plaintiff must show that "(1) he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse action." *Rivera v. Rochester Genesee Reg'l Transp.*, 743 F.3d 11, 24 (2d Cir. 2012) (quotations omitted).

To constitute "protected activity," a plaintiff's complaint must include "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race . . . or any other characteristic protected by Title VII." *Lehman v. Bergmann Assocs., Inc.*, 11 F. Supp. 3d 408, 417-18 (W.D.N.Y. 2014) (citation omitted). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Hanfland v. Brennan*, 2015 WL 6134177, *11 (W.D.N.Y. 2015) (citation omitted).

A plaintiff can show causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." *Gordon v. New York City Bd. of Ed.*, 232 F.3d 111, 117 (2d Cir. 2000).

### a. **Morales**

Morales alleges that he complained about differential treatment two times—at the March 27 Meeting and the April 13 Meeting. (Dkt. # M1 at 7). He apparently claims that Bottling Group retaliated against him by issuing the Last Chance Agreement and terminating his employment. (*Id.* at 5, 7-8). Bottling Group argues that Morales cannot establish that he engaged in protected activity, or the requisite causation. The Court agrees.

Morales testified that at the March 27 Meeting, he merely told Pitts and Flaherty that "[p]eople were treating [him] differently." (Dkt. # M31-5 at 28) ("Q: What did you say specifically? A: People were treating [me] differently."). He also admits that he did not specify who was treating him differently or how he was being treated differently. (*Id.* at 29). Moreover, Morales admits that at the April 13 Meeting, he only told Pitts that Flaherty was "treating him unfairly." (Dkt. ## M31-1 at ¶ 136; M36 at ¶ 20). Again, Morales did not provide Pitts with specific examples of this unfair treatment, and at his deposition, only testified that Flaherty "singled [him] out." (Dkt. # M36 at 52-53).

Based on this record, neither of Morales's two complaints put Bottling Group on notice that Morales thought he was being discriminated against because of his race or color. Without further clarity from Morales, those complaints, at best, suggest he was being treated unfairly, generally, which is insufficient to constitute protected activity. *See, e.g.*, *Brummel v. Webster Cent. Sch. Dist.*, 2009 WL 232789, *4-5 (W.D.N.Y. 2009) (complaints that employer did not like plaintiff and was treating her "differently" than other people were not protected activity; "[a]t no time did [plaintiff] allege that she was being treated differently because she was a woman, or that [employer] treated her or other women differently because of their gender") (collecting cases).

Nor is Morales's July 7, 2015, "Speak Up" complaint protected activity for purposes of this claim because he filed it the day after his termination. *See Brummell*, 2009 WL 232789 at *7 ("It is axiomatic that retaliatory activity cannot occur prior to the incident upon which the retaliation is predicated.").

In addition, almost three months elapsed between Morales's April 13 Complaint and his July 6 termination. Under these circumstances, that amount of time precludes an inference of causation. *See Murray v. Visiting Nursing Servs.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007)

("district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation") (collecting cases).

Assuming, without deciding, that Morales meets the causation standard based on the temporal proximity between the April 13 Complaint and his termination, Bottling Group clearly has satisfied its burden of identifying a legitimate, non-retaliatory reason for terminating him. Pitts determined, after performing the Audit, that Morales inaccurately reported his miles from May 24, 2015, through June 28, 2015, which resulted in a $290.40 mileage reimbursement overpayment. In Pitts's view, this violated not only company rules against misrepresenting facts and falsifying company records, but also the terms of the Last Chance Agreement, which Pitts issued to Morales based on repeated poor job performance and company policy violations.

In light of Bottling Group satisfying its burden, Morales's only evidence of causation—the somewhat close temporal proximity between the April 13 Complaint and July 6 termination—is insufficient, on its own, to suggest Bottling Group's reason was pretextual. *See Dixon v. Int'l Fed'n of Accountants*, 416 Fed. Appx. 107, 110-11 (2d Cir. 2011) (summary order) ("assuming *arguendo* that [plaintiff] established a *prima facie* case of retaliation, her poor work performance constituted a legitimate, non-retaliatory reason for her termination, and she fails to identify any evidence, apart from temporal proximity, to suggest that this reason was pretextual").

Therefore, Morales's claim for retaliation is dismissed.

### b. **Campbell**

Campbell claims that Bottling Group retaliated against him after the May 6 Complaint. (Dkt. # C1 at 5, 8). Campbell admits that the May 6 Complaint was the only time he ever made an allegation of race discrimination while employed by Bottling Group, and that the verbal

warnings which instigated the May 6 Complaint were removed from his file. (Dkt. # C56-3 at 56, 67). According to Campbell, though, after he complained, the "[h]arassment and discrimination ramped up," (Dkt. # C58 at 10, ¶ 16), and he was eventually fired.

Campbell's vague claim that "[h]arassment and discrimination ramped up" fails to set forth a materially adverse employment action. *See Bickerstaff v. Vassar Coll.*, 354 F. Supp. 2d 276, 280-81 (S.D.N.Y. 2004) ("In order to be considered 'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities . . . Exclusions from meetings or social functions do not constitute adverse actions"), *aff'd*, 160 Fed. Appx 61 (2d Cir. 2005) (summary order).

Campbell also fails to establish the requisite causal connection between his May 6 Complaint, which constituted protected activity, and his July 6, 2015, termination. As discussed elsewhere, even after the benefit of discovery, Campbell provides no direct proof of discrimination on the part of Bottling Group, and provides no indirect proof related to other similarly situated employees. Therefore, Campbell only bases causation on the temporal proximity of the May 6 Complaint and his July 6 termination.

Again assuming, without deciding, that the temporal proximity of two months is sufficient to satisfy Campbell's prima facie case, Bottling Group puts forth a legitimate, non-retaliatory reason for terminating Campbell. Specifically, Pitts determined that Campbell also falsified his miles from May 24, 2015, through June 28, 2015, which resulted in a $331.78 mileage reimbursement overpayment. In Pitts's view, this violated company rules. Therefore, as in Morales's case, the temporal proximity of the May 6 Complaint and termination, alone, cannot establish that Bottling Group's stated reason for Campbell's termination was pretextual. *See Dixon*, 416 Fed. Appx. at 110-11.

Accordingly, Campbell has failed to establish a prima facie case for retaliation under Title VII, and that claim is dismissed.

## CONCLUSION

For the above-stated reasons, Bottling Group's motions for summary judgment (Dkt. ## M31; C56) are **GRANTED**. Morales's Complaint (Dkt. # M1) and Campbell's Complaint (Dkt. # C1) are dismissed in their entirety and with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      April 15, 2019.